IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF HAVLEE S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF HAVLEE S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JESSE R., APPELLANT.

Filed October 8, 2019.    No. A-18-1122.

Appeal from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge. Reversed and remanded for further proceedings.

William E. Madelung, of Madelung Law Office, P.C., L.L.O., for appellant.

No appearance for appellee.

MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Jesse R. appeals the order of the county court for Scotts Bluff County, sitting as a juvenile court, terminating his parental rights to Havlee S. For the reasons set forth below, we reverse the decision of the juvenile court and remand the cause for further proceedings.

## II. BACKGROUND

Havlee, born in September 2014, is the biological daughter of Shelby D. and Jesse. Jesse was unaware that Havlee was his daughter until November 2016, and as a result, Havlee had almost no contact with Jesse until that time. Havlee lived with Shelby and her husband, Thomas D. Shelby, and Thomas had another daughter, Braylei D., who is not involved in this appeal. We discuss Braylei below only as necessary.

- 1 -

The Department of Health and Human Services (the Department) received an intake alleging that Havlee and Braylei were being neglected by their caregivers, Shelby and Thomas. The reporter stated that Shelby and Thomas used methamphetamine and Adderall and that they were asking around town for pain pills. The reporter also stated that law enforcement had been called to Shelby and Thomas' apartment due to fighting and that the children often sat in soiled diapers, which gave them severe rashes.

On April 26, 2017, Anna Brisco and Lauren Trenkle, child and family service specialists with the Department, as well as Rob Kiesel, an officer with the Scotts Bluff Police Department, investigated the intake at Shelby and Thomas' apartment. They found the children physically well. Shelby and Thomas were given drug tests. Both tested positive for amphetamine use, and Thomas tested positive for methamphetamine use. Shelby denied using methamphetamine. She insisted that her regular dose of prescribed Adderall caused the positive drug test result. Thomas explained that he had used methamphetamine one time several days before the investigation and that Shelby did not know about it. Shelby agreed to work on a voluntary case and to follow a safety plan that she and Brisco developed together.

On May 1, 2017, the State filed a petition alleging Havlee was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a)(Reissue 2016) as to both Shelby and Jesse. The State also filed Brisco's affidavit in support of custody. In her affidavit, Brisco stated that she believed placing Havlee and Braylei in temporary protective custody was necessary because she doubted Shelby's ability to honestly carry out her safety plan. The Department's safety monitor had expressed concerns that Shelby was "'not as clean as she claim[ed].'" Further, Shelby had friends and family members who were known users of methamphetamine and who participated in other criminal behavior. Brisco stated that taken together with Thomas' drug use, Shelby's situation presented ongoing concerns that were a serious threat to Havlee and Braylei's health, safety, and welfare. Although our record does not contain an order to that effect, the court apparently placed Havlee and Braylei in temporary protective custody with Braylei's paternal aunt.

The State later filed an amended petition alleging that Havlee lacked proper parental care because (a) Shelby was using controlled substances, (b) Havlee lacked safe and stable housing, (c) Shelby neglected Havlee's developmental and nutritional needs, and (d) Jesse abandoned Havlee. Shelby pled no contest to the allegations in the State's adjudication petition. Jesse, however, contested the adjudication.

### 1. ADJUDICATION HEARING

The court held an adjudication hearing on July 11, 2017.

### (a) Shelby's Testimony

Shelby testified that although she told Jesse that Havlee was his daughter just days after she was born, Jesse denied paternity. Jesse did not acknowledge that Havlee was his daughter until November 2016 when a DNA test confirmed that he was Havlee's biological father. He had only had contact with Havlee twice: once in November or December 2016 and a second time in February or March 2017. He had not bought clothes, attended doctor's appointments, provided insurance, asked for parenting time, or asked for Havlee to live with him. Shelby admitted that she

disliked Jesse. She was aware that Jesse's home had burned down, but she denied causing the fire that destroyed it.

### (b) Brisco's Testimony

Brisco testified that on April 26, 2017, she found Shelby and Thomas in their apartment with Havlee and Braylei. Two of Shelby and Thomas' friends, both of whom had prior involvement with the Department regarding their children, were also present. Havlee was removed from Shelby and Thomas' care that same day after Thomas tested positive for methamphetamine. After some investigation, Brisco discovered that Jesse was Havlee's father. Jesse and his mother came to Brisco's office at her request soon after Havlee was removed from Shelby and Thomas' care. Jesse told Brisco that Shelby's interference made it difficult for him to be part of Havlee's life before the State intervened. According to Jesse, Shelby told him that he was not Havlee's father, and she denied Jesse parenting time when he requested it. According to Brisco, Jesse advised that he did not find out that Havlee was his daughter until she was "quite a bit older." Brisco admitted that she did not visit Jesse's home to determine whether placing Havlee with him would be appropriate. Jesse told Brisco that someone had set his previous residence on fire.

### (c) Jesse's Testimony

Jesse testified that Shelby told him that she was pregnant, but that another man was the child's father. Jesse saw Havlee in the hospital after her birth. Later, a paternity test confirmed that Jesse was Havlee's father. After the paternity test, Jesse began paying child support for Havlee. Jesse had been allowed contact with Havlee about four times after her birth. He believed that he had a connection with Havlee. Shelby had recently denied Jesse contact with Havlee during a planned Thanksgiving Day visit. Jesse's residence burned down in December 2016. Because Jesse saw Shelby at his residence shortly after he discovered the fire, Jesse believed that Shelby caused the fire. As a result Jesse did not want to have any contact with Shelby. Jesse had space for Havlee in his residence and he believed he could provide safe and stable housing for her.

### (d) Adjudication Order

The juvenile court found that the State had proven by a preponderance of the evidence that Jesse had failed to provide Havlee with safe and stable housing and that he had abandoned her. The court noted that despite Jesse's willingness and ability to provide safe and stable housing at the time of the hearing, Jesse had failed to provide safe and stable housing to Havlee before the State's petition was filed. And because Jesse had little contact with Havlee before the petition was filed and provided her with no clothes or other gifts, the court found he had abandoned her.

### 2. DISPOSITION HEARING

A disposition hearing was held on July 18, 2017. The court received a case plan and court report, dated July 14, 2017. The Department's goals and strategies for Jessie included providing safe and stable housing; allowing the Department to do a walk-through of his home to check for the safety of the home environment for Havlee; maintaining stable housing with appropriate supplies for Havlee and no inappropriate and unsafe individuals in the home; participating in a psychological evaluation; participating in a parent-child interaction evaluation; following the

recommendations set forth in the results of all evaluations; working on building a relationship with Havlee; participating in supervised parenting time visits with Havlee; and participating in Child/Parent Pscychotherapy to work on gaining an understanding to Havlee's age and specific needs and nurture an appropriate relationship. The court also received a report from Havlee's guardian ad litem, which explained that Jesse had been cooperative with the Department and agreeable to working with a therapist to build his relationship with Havlee.

The juvenile court found that the Department had made reasonable efforts to return Havlee to her home, but that the circumstances leading to her removal had not changed. Thus, the court ordered that Havlee was to remain in the Department's custody. Finding the provisions of the Department's case plan to be reasonably material to eliminating the conditions for which the adjudication was obtained, the court adopted it.

### 3. OCTOBER 3, 2017, REVIEW HEARING

The court held a review hearing on October 3, 2017. The court received the guardian ad litem's report, which provided that Jesse and Havlee were attending therapy together and that Jesse interacted with Havlee as much as she would let him. The court also received the Department's case plan and court report, dated September 28, which contained the same goals and strategies for Jesse. The report noted that although Jesse had not yet engaged the services beyond supervised parenting time, he was very open to doing so. Jesse attended 15 of the 21 supervised parenting time visits he was offered. The case plan listed a permanency objective of reunification for Havlee. Shelby also testified at the hearing that she did not understand why Jesse was receiving supervised parenting time. She felt that introducing Havlee to Jesse would only confuse Havlee as she has known Thomas as her father up until this point in her life. The court adopted the Department's case plan and court report, including the permanency objective.

### 4. DECEMBER 19, 2017, AND JANUARY 9, 2018, REVIEW AND PLACEMENT HEARING

The court held a review and placement hearing on December 19, 2017, and January 9, 2018.

The court received the Department's case plan and court report, dated December 12. The report explained that Havlee was struggling to form a relationship with Jesse as she had not known him for most of her life. However, Havlee was beginning to become excited for Jesse's visits, rather than shying away or throwing temper tantrums. Jesse asked to reschedule two visits in November 2017 due to work conflicts. Jesse also refused a week of visits because he was not able to have them in his home. And although the Department's caseworker changed, Jesse had failed to contact the new caseworker about the status of Havlee's case. The plan suggested maintaining a primary permanency objective of reunification, and contained the same goals and strategies for Jesse as the Department's previous case plans.

The court also received the guardian ad litem's report, dated December 19, 2017. The guardian ad litem observed that Jesse moved from a trailer into a house and that he had maintained stable employment for over 2 years. Jesse completed a psychological evaluation, although the report was not ready. She noted that Jesse had missed some parenting time because of a mixup

with the provider. Havlee and Jesse were engaged in therapy together, and the guardian ad litem observed "tremendous" progress in their relationship.

The court adopted the case plan and court report and set a date for a future review hearing.

## 5. APRIL 3, 2018, REVIEW AND PERMANENCY HEARING

The court held a review and permanency hearing on April 3, 2018.

The court received the guardian ad litem's report, dated April 2, 2018. The guardian ad litem noted that Jesse's progress in building a relationship with Havlee had stalled over the last review period on account of his missing visits. Jesse had difficulty adjusting to changes in the supervision staff. He also expressed concerns that the State's case forced him to have contact with Shelby. Havlee once called Jesse during Shelby's parenting time. Jesse explained to Havlee that he would visit her after the case was over when he would not have to deal with the State.

The court also received the Department's case plan and court report, dated April 2, 2018. Jesse had missed significant amounts of his supervised parenting time in December 2017 due to illness and work. He did not attend any of his supervised parenting time in February or March. Supervised parenting time was scheduled for Jesse three times per week, generally on Wednesday evenings and the weekends. On March 15, the parenting time supervision provider rearranged Jesse's scheduled parenting time to better accommodate his work schedule. Nevertheless, he still missed all of his visits for the remainder of the month. Jesse maintained safe and stable housing and he continued to have sustainable employment. He lived with his girlfriend and her children, and he took a second job in an attempt to provide for that family. During the review period, Jesse was charged with driving under the influence and assault, which charges he felt were "'total bogus.'" The case plan provided a permanency objective of reunification with a concurrent plan of adoption, and contained the same goals and strategies for Jesse as his other case plans.

The juvenile court adopted the Department's case plan and court report, including its alteration of the permanency objective. The court also ordered Jesse to undergo alcohol and drug testing before each supervised visit.

## 6. MOTION TO TERMINATE PARENTAL RIGHTS

On May 8, 2018, the State filed a motion to terminate Jesse's parental rights. The motion alleged statutory grounds for termination under Neb. Rev. Stat. § 43-292 (Reissue 2016), specifically subsections (1) abandonment, (2) neglect, and (6) failure of reasonable efforts to correct the conditions leading to an adjudication under § 43-247. Although not in our record, the State also filed a motion to terminate Shelby's parental rights.

## 7. JULY 10, 2018, REVIEW AND PERMANENCY HEARING

The juvenile court held a review and permanency hearing on July 10, 2018. Caroline Teeple, the Department caseworker assigned to Havlee's case, and Samantha Konopnicki, a family support worker with McConaughy Discovery Center, testified.

The court received and adopted the Department's case plan and court report, dated July 9, 2018. The report provided that due to illnesses and rescheduled work, Jesse missed significant parenting time in April and June. However, Jesse attended all of his scheduled parenting time in May. During her visits, Jesse and Havlee consistently engaged one another. Jesse reported that

Havlee was cooperative at home when asked to perform chores. Jesse was tested for drugs and alcohol before each visit. Jesse tested positive for alcohol before three visits. Although an April 16 field test showed positive results for methamphetamine, opiates, and PCP, a lab test of the same sample yielded negative results for all substances. The case plan suggested continuing the permanency objective of reunification with a concurrent plan of adoption. The case plan only contained the goals and strategies related to maintaining safe and stable housing.

The court also received the guardian ad litem's report. The guardian ad litem noted that Jesse completed his psychological evaluation and a followup discussing the evaluation. Jesse also successfully maintained his home and employment. She further noted that Jesse had been suffering with substantial health issues for 8 months during this case, which caused him to miss a significant amount of his parenting time. She explained that during the last review period, he was diagnosed with Crohn's disease. The driving under the influence charge had been dismissed and the misdemeanor assault charged was reduced to mutual consent assault, for which Jesse received a fine.

### 8. MOTION FOR NEW PLACEMENT

At some point, the Department notified the parties that on August 26, 2018, Havlee would be removed from placement with Braylei's aunt and placed with Jesse's mother, Haley R. Shelby filed an objection to the Department's planned placement as well as a motion for new placement. The juvenile court held a hearing on Shelby's motion on August 28. Shelby argued that the State should place Havlee with her father, David S., rather than Jesse's mother. Cassie Beasant, Havlee's caseworker at the time of the hearing, Shelby, David, and Haley testified. The testimony revealed that David lived with his girlfriend, and the Department had several intakes and investigations against this girlfriend. David also had a poor relationship with Jesse, which would cause trouble during his parenting time. Further, Havlee had already settled into Haley's care. As a result, the court denied Shelby's motion.

### 9. TRIAL ON MOTION TO TERMINATE PARENTAL RIGHTS

Trial was held on the State's motions to terminate Jesse's and Shelby's parental rights on September 20, 2018.

### (a) Aschenbrenner's Testimony

Tiana Aschenbrenner testified that she works for Family 4ward, a company that provides visits and drug testing for clients that are involved with the Department. She had been supervising Jesse's visits with Havlee since May 30, 2018. The visits occurred at Jesse's home and were scheduled around his work schedule. Jesse's fiance was also present during these visits as well as, occasionally, her three children. Jesse had been consistent in attending his parenting time since she began supervising it. He had attended 31 of the 46 scheduled visits. Three of the scheduled visits that Jesse did not attend were cancelled by Aschenbrenner or the foster family. Jesse was required to confirm that he would attend a scheduled visit by calling the provider by 8 p.m. the day before a scheduled visit. Jesse missed five visits because he failed to confirm that he would attend. Jesse missed visits because of illness and work schedule conflicts. Most of his missed visits occurred just after Aschenbrenner became the parenting time provider.

When Jesse's fiance's children were present during Jesse's parenting time with Havlee, Havlee would spend most of the parenting time playing with them. Otherwise, Jesse spent most of his supervised parenting time one-on-one with Havlee. Jesse would prepare healthy and balanced meals for Havlee. He also provided her with a second food option whenever she refused to eat what he had prepared for the family. During the time of her supervision, Aschenbrenner observed substantial progress in Jesse's relationship with Havlee.

### (b) Kiesel's Testimony

Kiesel, an investigator with the Scottsbluff Police Department, testified about his investigation of Shelby and Thomas' home on April 26, 2017. Thomas, Shelby's mother, and four other individuals in the apartment tested positive for methamphetamine. Shelby tested positive for amphetamines, which she claimed was the result of her Adderall prescription. The children were removed from Shelby and Thomas' care on May 1.

### (c) Teeple's Testimony

Caroline Teeple, a caseworker with the Department, testified that she was assigned to Havlee and Braylei's case from December 13, 2017, to July 29, 2018. When she was assigned the case, she understood the main concerns with Shelby and Jesse to be demonstrating sustainable sobriety and consistency with parenting time as well as following through with appointments and services. The Department was providing Shelby and Jesse supervised parenting time, drug testing, referrals for evaluations, family team meetings, and other services.

From December 2017 to March 2018, Jesse was not consistent in attending his parenting time. Jesse and Havlee attended child-parent psychotherapy. Initially, Jesse was consistent in attending his counseling appointments, but eventually there was some drop off in the consistency of his attendance. Jesse completed a psychological evaluation while Teeple was assigned to the case. Although the evaluation was not offered into evidence, Teeple testified that the evaluation showed that Jesse met the diagnostic criteria for a mild alcohol use disorder as well as antisocial personality traits.

Jesse tested positive for alcohol use several times while Teeple was assigned to the case. He also had one positive field test result for methamphetamines, opiates, and PCP, but when tested again at the lab, the results of this test came back negative. The lab technician explained that lab negatives sometimes occur when a subject was "huffing." Teeple admitted that there was no evidence Jesse was "huffing" and that no other drug tests yielded positive results for anything accept alcohol. Jesse adamantly denied using drugs of any sort before the positive field test. Teeple had no evidence that Jesse used alcohol in excess or that his alcohol consumption affected Havlee. Teeple could not remember speaking with Jesse about his potential for an alcohol or substance use disorder.

Jesse did not visit Havlee at all during the months of February and March. When Teeple asked him about his missed visits, he told her that he would probably be better seeing Havlee after the case with Shelby ended. He also explained that he had no part in the case and that he did not understand why he was required to have supervised parenting time. In April, Jesse attended only 29 percent of his visits. In May, he attended 100 percent of his scheduled visits. The provider had reduced the frequency of Jesse's parenting time in May from three times per week to once per

week in May. In June, Jesse attended 33 percent of his scheduled parenting time. Teeple explained that Jesse missed visits when he had obligations with his other children, when he was ill, and when he was called into work. Jesse's interactions with Havlee were always quite positive. Jesse met his case goals related to housing and employment. However, his progress in developing a relationship with Havlee was variable.

### (d) Beasant's Testimony

Cassie Beasant, a caseworker with the Department, testified that she was the original caseworker assigned to Havlee and Braylei's case. She was reassigned to the case a month before trial. When she was first assigned to the case, Havlee and Braylei were both tested for drugs using hair follicle tests. Braylei's hair tested positive for the presence of methamphetamine, cannabis, and THC. Havlee's hair did not test positive for any substance.

When Beasant was assigned to the case, Jesse did not have any relationship with Havlee at all. Beasant understood that Shelby's behavior was the main barrier to Jesse's relationship with Havlee. To develop a relationship between Havlee and Jesse, the Department arranged supervised parenting time and family therapy. Jesse was consistent in attending the therapy sessions. Jesse was more consistent in attending parenting time in the month before trial than he had been in the first 6 months that Beasant had been assigned to the case. Beasant had not observed Jesse interact with Havlee, but she did not feel the supervised parenting time provider's notes indicated that he had developed a strong relationship with Havlee. Havlee's therapist had indicated that Jesse and Havlee's therapy status could be reduced to "as needed," and so Jesse and Havlee were not receiving family therapy at the time of trial. Beasant had not done a walk-through of Jesse's home and could not speak to its safety. Beasant had not spoken with Jesse in the month that she had been reassigned to the case, and she had not observed the relationship Havlee had with Jesse.

### (e) Jesse's Testimony

Jesse testified that he discovered Havlee was his daughter in November 2016. He did not have a substantial relationship with Havlee before this case began because he had relational issues with Shelby. He did not petition the court for custody of or parenting time with Havlee before the State intervened. Jesse had an 8-year-old daughter from another relationship. Havlee and Jesse's other daughter have met and get along pretty well. Jesse lived with his fiance and her children, when they were not with their father.

Jesse worked at a local furniture store. When he missed work for court or illness, he was required to make up his missed hours. In April 2018, Jesse was diagnosed with Crohn's disease and was hospitalized for 3 days, which condition caused him severe abdominal pain and bleeding. Jesse missed his scheduled parenting time with Havlee because of his illness and because he had to make up hours at work that he had missed for court dates. In addition to court dates related to this case, Jesse had court dates scheduled in a criminal proceeding. At the time of trial, Havlee was living with Jesse's mother, and Jesse went over to his mother's house to see Havlee three times. He would like Havlee to be placed with him. Jesse paid his child support obligation for both Havlee and his other daughter.

### (f) Haley's Testimony

Haley believed Havlee was thriving in her care. Havlee was usually happy when she came back from Jesse's parenting time, although she was often tired as it was late in the evening when she returned. Havlee was excited before visits with both Shelby and Jesse. Haley had participated in Jesse's parenting time four or five times, and she observed Jesse and Havlee to have a positive relationship.

### (g) Evidence Regarding Shelby

Although Shelby is not part of this appeal, we recount briefly the evidence pertaining to her at the termination trial as it relates to Jesse's arguments on appeal.

The record shows that Shelby was reluctant to engage in services as recommended by the family support worker, blaming Thomas for the removal of the children. During parenting time with Shelby, Havlee engaged in temper tantrums, and Shelby failed to discipline her or model appropriate parenting. Shelby separated from Thomas and began a relationship with another man, with whom she had a child during the pendency of the case. Shelby did not establish stable, consistent housing during the case, and held jobs only sporadically. Shelby missed multiple visits with Havlee. She failed to complete parenting and psychological evaluations as requested early in the case, and failed to follow through with recommended therapy. About 1 month before trial, Shelby had a parental capacity evaluation, which evaluation showed that she exhibited characteristics similar to known child abusers. The diagnostic impressions from the evaluation were that Shelby had an adjustment disorder with anxiety, attention deficit hyperactivity disorder (ADHD), an amphetamine-type substance use disorder, and alcohol use disorder.

Shelby had been making positive progress in the month before the termination trial. She had obtained employment, had her own apartment, and had been more consistent in exercising her visitation. She had demonstrated more effective parenting skills and a growing relationship with her children. She had made improvement in appropriately disciplining and engaging with the children. Beasant noted, however, that Shelby had shown similar progress during the pendency of this case, which progress had never lasted longer than 3 months. The family support worker noted that Shelby was doing very well, and that there were no safety concerns for her interactions with the children. The psychologist's report indicated that Shelby was safe for attempted reunification provided she cooperates with the mental health recommendations. Nevertheless, placement with Shelby was still unsafe because she had not established appropriate boundaries with her mother, who used drugs. Shelby had complied with all requested drug testing during the case and tested negative for all substances. At the time of trial, Shelby planned to divorce Thomas.

### 10. ORDER

On October 31, 2018, the juvenile court entered an order on the State's motions for termination of Shelby's and Jesse's parental rights. The court found that the State failed to present clear and convincing evidence to support statutory grounds for termination of Shelby's parental rights under § 43-292(2) and (6). As to Jesse, however, the court found that the State proved statutory grounds for termination under § 43-292(1), (2), and (6). The court noted that Jesse had no relationship with Havlee before the State intervened in this case. While the court admitted that

Shelby made contact between Jesse and Havlee difficult, it noted that Jesse never filed a legal case for custody or parenting time and failed to make his relationship with Havlee a priority. In the 6 months before the State filed a motion to terminate his parental rights, Jesse had seen Havlee only 10 times. Thus, the court found that despite demonstrating the ability to care for Havlee's needs, Jesse failed to demonstrate a sustained interest and motivation to be active in Havlee's life. Additionally, the court stated that Jesse failed to complete a psychological evaluation or a parent-child evaluation and that he was charged with criminal conduct during the pendency of this case. The court also found Jesse unwilling or incapable of rehabilitating himself in the foreseeable future and thus found that terminating Jesse's parental rights would be in Havlee's best interests.

Jesse appeals.

## III. ASSIGNMENTS OF ERROR

Jesse assigns, restated, that the juvenile court erred in finding that (1) statutory grounds for termination existed under § 43-292 (1), (2), and (6) and that (2) termination of his parental rights to Havlee was in her best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Reality W.*, 302 Neb. 878, 925 N.W.2d 355 (2019). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Aly T. & Kazlynn T.*, 26 Neb. App. 612, 921 N.W.2d 866 (2018).

## V. ANALYSIS

### 1. STATUTORY GROUNDS

Under Neb. Rev. Stat. § 43-292 (Reissue 2016), in order to terminate parental rights, the State must prove, by clear and convincing evidence, that one or more of the statutory grounds listed in this section have been satisfied and that termination is in the child's best interests. *In re J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018). Clear and convincing evidence is the amount of evidence that produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven. See *In re Interest of Gavin S. & Jordan S.*, 23 Neb. App. 401, 873 N.W.2d 1 (2015).

In the present case, the juvenile court found that the State established by clear and convincing evidence that grounds for termination existed under § 43-292(1), (2), and (6).

Section 43-292(1) requires proof that "[t]he parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition." For purposes of § 43-292(1), "abandonment" is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016) (evidence supported abandonment parent did not visit child during 6-month period before termination petition filed, had minimal contact with child in 22-month period from when child went into foster care until petition was filed, and there were significant gaps between parent's visits

during period). To prove abandonment in determining whether parental rights should be terminated, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities. *Id.* A court reviewing a termination of parental rights case on the ground of abandonment need not consider the 6-month period in a vacuum. *Id.* Instead, the court may consider evidence of a parent's conduct, either before or after the statutory period, in determining whether the purpose and intent of that parent was to abandon his or her children. *Id.* Parental obligation requires a continuing interest in the child and a genuine effort to maintain communication and association with that child. *Id.*

Section 43-292(2) requires proof that "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. The questions of what constitutes neglect and necessary parental care and protection are generally determined on a case-by-case basis, but common factual patterns include parental incarceration, adjudication, involuntary termination, or relinquishment of previous children, unsanitary house and unkempt children, or addiction to drugs or alcohol. See *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017).

Section 43-292(6) requires proof that "following a determination that the juvenile is one described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family if required under section 43-283 under direction of the court, have failed to correct the conditions leading to the determination." It is the burden of the State, and not the parent, to prove by clear and convincing evidence that the parent has failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the case plan. *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009). The State is required to prove that the parents have been provided with a reasonable opportunity to rehabilitate themselves according to a court-ordered plan and have failed to do so. *In re Interest of Aly T. & Kazlynn T.*, 26 Neb. App. 612, 921 N.W.2d 856 (2018) (evidence supported termination under § 43-292(6) where parent did not follow through with various mental health services, failed comply with urinalysis testing, missed visits with child, and failed to comply with other provisions of rehabilitation plan).

With this backdrop concerning the statutory grounds at issue in this case, we conclude that the juvenile court erred in finding that the State proved each of these grounds by clear and convincing evidence.

Jesse was apparently unaware that he was Havlee's father until testing established his paternity when she was approximately 2 years old. After that time, Shelby to some extent impeded Jesse's involvement with Havlee. After this case was initiated, Jesse complied with much of the case plan established by the Department. He maintained stable housing and employment; he obtained a psychological evaluation (contrary to court's finding in its termination order); and he attended parent-child therapy with Havlee. Jesse has also paid his child support obligation for Havlee.

After the case was initiated, Jesse was mostly consistent in attending the scheduled supervised parenting time with Havlee. Through the parenting time and therapy, Jesse and Havlee began to develop a positive relationship. Both the visitation supervisor and Havlee's guardian ad

litem noted that there was substantial progress in Jesse and Havlee's relationship and that Jesse provided appropriate care for Havlee. However, beginning in early 2018, Jesse became inconsistent in attending his parenting time. The record shows that at this time, Jesse began experiencing serious health problems, which culminated in his hospitalization and eventual diagnosis of Crohn's disease in April 2018. Jesse's health issues caused him to miss both work and parenting time. We acknowledge that Jesse did not visit Havlee at all during the months of February and March, and was sporadic during the month of April. In May, he attended 100 percent of his scheduled visits. The provider had reduced the frequency of Jesse's parenting time in May from three times per week to once per week. In June, Jesse attended 33 percent of his scheduled parenting time.

The record shows that much of Jesse's missed parenting time was related to factors arguably beyond his control, namely, his undiagnosed Crohn's disease and his work schedule, which shifted whenever he had to miss work due to illness or a court date. The record is also clear that Shelby presented a significant barrier to Jesse developing a relationship with Havlee both before the case was initiated and during it.

Overall, the record reveals a father who has made significant attempts and progress toward developing a relationship with his daughter. He has complied with the requirements of the case plan by maintaining stable housing and employment, he completed a psychological evaluation, and he has participated in therapy with Havlee. Jesse provided appropriate care to Havlee during his parenting time. Although Jesse's parenting time was inconsistent for a while as noted above, he did make efforts during the 6 months prior to the termination motion. Jesse's actions or inactions did not evidence an intent to forego his parental rights or obligations.

In our de novo review, we conclude that the record does not clearly and convincingly supports the juvenile court's finding of abandonment or neglect by Jesse sufficient to support termination of his parental rights. Likewise, the record did not support a finding that Jesse had been afforded sufficient reasonable efforts to reunify with Havlee, or that the reasonable efforts made clearly failed to correct the conditions leading to Havlee's adjudication as to Jesse.

## 2. BEST INTERESTS

Although we have determined that the juvenile court erred in finding that the State had proved statutory grounds for termination, for the sake of completeness, we address the best interest prong.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Jade H. et al.*, 25 Neb. App. 678, 911 N.W.2d 276 (2018). A parent's right to raise his or her child is constitutionally protected. Before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Austin G.*, 24 Neb. App. 773, 898 N.W.2d 385 (2017). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *In re Interest of Aly T. & Kazlynn T.*, 26 Neb. App. 612, 921 N.W.2d 866 (2018).

In our de novo review of the record, we cannot say that the evidence supports a finding that Jesse was unfit. As discussed above, Jesse complied with many of the case plan goals and strategies. Jesse was precluded from developing a relationship with Havlee after learning he was her father primarily due to Shelby's actions. Through parenting time and therapy, Jesse developed a positive, significantly improved, relationship with Havlee. Although Jesse's parenting time became sporadic during the early part of 2018, this was due in large part to his serious health issues and impacted work schedule. The State filed its petition to terminate Jesse's parental rights only 12 months after the case was initiated.

Although Jesse was charged with driving under the influence and assault during the course of this case, the records contain no information about the facts leading to these charges, the driving under the influence charge was dropped, and Jesse was convicted of the lesser charge of assault by mutual consent. There was also some evidence to suggest that Jesse consumed alcohol before three visits with Havlee and his psychological evaluation showed that he met the diagnostic criteria for mild alcohol use disorder. However, the case plan did not require Jesse to refrain from alcohol use and there was no testimony about the amount of alcohol Jesse consumed or whether that use had any effect on his parenting time with Havlee.

The law does not require perfection of a parent; rather, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Lizabella R.*, 25 Neb. App. 421, 907 N.W.2d 745 (2018). Here, the record shows that Jesse had begun to build a positive bond with Havlee during the course of this case. He also demonstrated positive parenting skills, provided a safe and stable home, maintained consistent employment, and paid child support for Havlee. He has clearly shown a desire and willingness to parent Havlee. While there was some interruption in Jesse's progress during the case, much of this interruption was due to the mitigating factors of his medical issues and work demands, and in some part, due to the very strained relationship with Shelby. Through medical treatment and changes to his parenting time schedule to accommodate his work schedule, Jesse had renewed his commitment to reunification at the time of the termination trial. In short, Jesse should be afforded more time to accomplish the goals set out by the Department.

The State failed to prove by clear and convincing evidence that termination of Jesse's parental rights was in Havlee's best interests.

## VI. CONCLUSION

After a de novo review of the record, we conclude that the State failed to prove by clear and convincing evidence that any of the statutory grounds for termination existed or that termination of Jesse's parental rights was in the best interest of Havlee. We reverse the order of the juvenile court terminating Jesse's parental rights and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.